**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **LISA ANDERSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 09 C 2399** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **Magistrate Judge Sheila Finnegan** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Lisa Anderson brings this action under 42 U.S.C. § 405(g), seeking to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits under Title II of the Social Security Act. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff filed a motion for summary judgment seeking reversal of the ALJ's decision. On April 26, 2010, the case was reassigned to this Court for all further proceedings. After careful review of the parties' briefs and the record, the Court now grants Plaintiff's motion and remands the matter for further proceedings consistent with this ruling.

## PROCEDURAL HISTORY

Plaintiff applied for disability insurance benefits on August 9, 2006, alleging that she became disabled on August 25, 1996 from a variety of impairments, including a brain tumor, fibromyalgia, depression, detached retinas, cataracts, headaches and a dislocated knee cap. (R. 112, 123). The Social Security Administration denied the application initially

on November 2, 2006, and again on reconsideration on February 22, 2007. (R. 54, 55, 67-71, 76-79). Pursuant to Plaintiff's timely request, Administrative Law Judge ("ALJ") Joel G. Fina held an administrative hearing on January 8, 2008. The ALJ heard testimony from Plaintiff, who appeared with counsel, Plaintiff's husband, and a vocational expert. Approximately two weeks later, on January 23, 2008, the ALJ found that Plaintiff is not disabled because she is capable of performing a significant number of jobs available in the national economy. (R. 59-66). The Appeals Council denied Plaintiff's request for review on February 26, 2009, and Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. (R. 1-3).

Plaintiff advances three grounds for reversal, all of which concern the ALJ's analysis at Step 5 where he decided that Plaintiff could make an adjustment to other jobs that existed in the economy, given her vocational factors of residual functional capacity ("RFC"), age, education, and work experience. *See* 20 C.F.R. § 404.1520(g)(1). Plaintiff first argues that the ALJ erred by applying the age categories of the regulations in a mechanical manner to classify her as a "younger individual" rather than considering whether her borderline age made it more appropriate to categorize her in the next higher age category, resulting in a finding of disabled. Plaintiff next asserts that the ALJ erred in finding her testimony concerning the severity of her headaches less than fully credible, and in omitting discussion of certain evidence. Finally, Plaintiff contends that the ALJ failed to include any limits in her RFC that her headaches might impose on her ability to sustain full-time work.

**FACTUAL BACKGROUND**

Plaintiff was born on March 24, 1952, and was 49 years old as of her date last insured ("DLI") of December 31, 2001.  (R. 16, 112).  She is a high school graduate, and has additional certifications from her local school district.  (R. 17).  Her past relevant work was as a teacher's aide.  (R. 124, 147).

**A.     Plaintiff's Medical History**

**1.     Brain Lesion**

In 1995, Plaintiff was diagnosed with an "enhancing mass in the right cavernous sinus and extending inferiorly into the skull base," which caused her to suffer painful right ophthalmoplegia,[1] diplopia (double vision) and headaches.  (R. 278).  On August 25, 1995, Dr. Gail L. Rosseau of the Chicago Institute of Neurosurgery and Neuroresearch performed a right temporal craniotomy for biopsy of the cavernous sinus lesion.  Following the surgery, Plaintiff's diplopia resolved, and steroids alleviated her headaches with continued use.  (*Id.*).

On September 13, 1996, an MRI revealed that "the right cavernous sinus was possibly larger and that the adenoid tissues were significantly larger than on previous studies, particularly on the right."  (*Id.*).  Plaintiff had a nasopharyngeal biopsy on December 3, 1996, and in January 1997, Dr. Rosseau recommended that she get second opinions to "help in establishing an as-yet elusive diagnosis."  (R. 279).  Dr. Rosseau described Plaintiff as having "an eighteen month history of intractable headaches," and

---

[1]     Ophthalmoplegia is "a paralysis or weakness of one or more of the muscles that control eye movement."  The Free Dictionary, http://medical-dictionary.thefreedictionary.com/ophthalmoplegia (last visited June 10, 2011).

offered to refer her to a headache specialist. (R. 278-79). Plaintiff declined to seek any headache treatment at that time. (R. 279).

Plaintiff had regular follow-up exams with Dr. Rosseau in 1997 and 1998 to monitor the lesion. MRI results from those years all showed little to no significant changes in the size of the lesion. (R. 287-95). On June 23, 1998, Dr. Rosseau observed that Plaintiff's condition was stable, and that she was experiencing "no further headaches or visual obscurations." (R. 273). On December 15, 1998, Plaintiff told Dr. Rosseau that she had "occasional stress-related headaches for which she is taking, at worst, up to six ibuprofen a day and . . . up to three Tylenol #3 per day." Plaintiff indicated that the headaches are related to what she believed to be "an unusually large intake of coffee and chocolate, which she is not able to reduce." (R. 272).

### 2. Headache Treatment

Several months later, Plaintiff decided to pursue Dr. Rosseau's suggestion and seek treatment for her headaches with Dr. Seymour Diamond of the Diamond Headache Clinic ("DHC"). She completed some intake paperwork on May 6, 1999, and scheduled an appointment for May 20, 1999. (R. 235-39). Over the next eight years, Plaintiff received regular treatment from both Dr. Diamond and Dr. Rosseau.

When Plaintiff saw Dr. Rosseau on May 7, 1999, she reported "intermittent headaches, which are unchanged in the last year." (R. 271). She told Dr. Rosseau that decreasing her coffee intake did not change the headaches, and that she continued to take four to six ibuprofen tablets a day and up to three Tylenol #3 per day. (*Id.*). An MRI taken at the same time showed no significant change in the size of the brain lesion. (R. 285-86).

On May 20, 1999, Dr. Diamond examined Plaintiff and started her on Vivactil and Indocin. (R. 229). Four days later, Plaintiff told Dr. Diamond that she was "overall doing well," but that over the previous four days, she had had one headache at a pain level of 7 to 8 out of 10, and one headache at a level of 5 out of 10. (*Id.*). On June 3, 1999, Dr. Diamond took Plaintiff off Indocin because of the side effects (muscle weakness, loss of energy, drowsiness, stomachaches and heartburn), but kept her on Vivactil and added Midrin. (R. 228). Shortly thereafter, on June 23, 1999, Dr. Diamond switched Plaintiff to Vioxx, along with Tylenol #3 as a "rescue drug." (*Id.*). By August 12, 1999, Plaintiff reported she "feels great" on the Vioxx, but had experienced five severe headaches that left her bedridden, and was still having one mild headache per week. (R. 227). The following month, she called Dr. Diamond for medication refills, and reported having headaches once a week. (*Id.*).

At her next appointment on November 16, 1999, Plaintiff told Dr. Diamond that she was having one to two severe headaches and one to two mild headaches per week. (R. 226). For the previous two weeks, she had woken up in the middle of the night with a headache. (*Id.*). Dr. Diamond increased her Vivactil and continued her on Vioxx and Tylenol #3. (*Id.*). Plaintiff returned to Dr. Rosseau on November 23, 1999, and reported that her headaches "are currently well tolerated on the medications prescribed by Dr. Diamond," including Vivactil and Vioxx. (R. 270). An MRI taken that day showed no significant change in the size of the lesion, and Dr. Rosseau instructed Plaintiff to return in six months. (R. 270, 284).

Three days later, on November 26, 1999, Plaintiff told Dr. Diamond that she was experiencing an increase in headache frequency due to "family stress," and she requested

5

more Tylenol #3. (R. 226). Dr. Diamond increased Plaintiff's Vivactil at that time. (*Id.*). On February 4, 2000, Plaintiff complained of headaches at a level of 5 out of 10, along with nausea and vomiting. (R. 225). Tylenol #3 was not providing any relief, so Dr. Diamond prescribed Vicodin. (*Id.*). Plaintiff saw Dr. Rosseau for an early follow-up exam on February 18, 2000 due to recurrent headaches that month. (R. 269). An MRI taken that day showed no significant change in the size of the lesion. (R. 269, 282). Dr. Rosseau indicated that Dr. Diamond was treating Plaintiff with prednisone, and urged her to continue in his care. (R. 269). Shortly thereafter, on February 29, 2000, Dr. Diamond noted that Plaintiff was "doing better" since he switched her from a generic form of Vivactil back to the brand name. (R. 224). Plaintiff complained of headaches that start around 3 p.m., for which she takes Tylenol #3 and then goes to sleep. (*Id.*). She complained that the headaches initially go away, but then return in the late evening along with double vision. (*Id.*). Dr. Diamond prescribed Decadron to help with the pain. (*Id.*).

At an appointment with Dr. Diamond on July 27, 2000, Plaintiff was "doing well," and reported that Tylenol #3 relieved a headache she had the previous night. (R. 222). By November 16, 2000, Plaintiff was experiencing no severe headaches, and three to four mild to moderate headaches per week. (R. 221). On March 27, 2001, Dr. Rosseau observed that her headaches were "much improved," and she "has them perhaps 3 times a week and they are well controlled with the medications prescribed by Dr. Diamond." (R. 268). Dr. Rosseau found Plaintiff to be stable, and noted that there was a decrease in size of the right cavernous sinus lesion. (R. 268, 280-81).

In May 2001, Plaintiff told Dr. Diamond that she was having three to four moderate to severe headaches per week, but was "able to abort" them with medications. (R. 220).

When Plaintiff saw Dr. Diamond on November 8, 2001 (approximately seven weeks before her DLI of December 31, 2001), she reported having "the best summer," without severe headaches. (R. 219). On six or seven occasions, however, she experienced headaches at a level of 7 out of 10, and in the fall she sometimes had headaches twice a week. (*Id.*). She generally took Tylenol #3 and laid down to treat the pain. (*Id.*). Dr. Diamond noted that when Plaintiff has a headache, she experiences nausea and sensitivity to light and sound, and that strong smells can trigger her headaches. (*Id.*).

Plaintiff returned to Dr. Rosseau for a follow-up appointment on March 27, 2002, and reported that was "very pleased with her current headache management by Dr. Seymour Diamond," and that her "headaches are well controlled with Vivactil, occasional Vioxx, and ibuprofen and Tylenol #3 once to twice per week." (R. 257). Dr. Rosseau observed that Plaintiff's most recent MRI dated March 12, 2002 showed that the lesion was "the same size or slightly smaller when compared with the previous study of 3/20/2001." (*Id.*). She instructed Plaintiff to return in one year. (*Id.*).

On June 18, 2002, Plaintiff told Dr. Diamond that she was still having headaches two to three times a week at a level of 5 to 7 out of 10. (R. 218). She said that she could stop the headaches with Vioxx, ibuprofen, Tylenol #3 and rest. (R. 217-18). On November 5, 2002, Plaintiff reported she was experiencing an average of two migraines a week at a level of 5 to 6 out of 10. (R. 217). Dr. Diamond continued her on Vivactil, Vioxx and Tylenol #3. (*Id.*).

At her annual visit with Dr. Rosseau on May 6, 2003, Plaintiff reported doing well until approximately April 20, 2003, when she developed "spontaneous diplopia" that "was associated several days later with a sudden headache in the back of her head." (R. 253).

Plaintiff did not have a headache at the time of the exam, but Dr. Rosseau noted that an MRI taken that day showed an increase in the size of the lesion. (*Id.*). When Plaintiff returned to Dr. Rosseau's office on May 23, 2003, Dr. Kenneth Heiferman indicated that her headaches were stable and she had no new complaints. (R. 251).

On August 7, 2003, Plaintiff told Dr. Diamond that she was experiencing three severe headaches per week. (R. 213). Nine months later, on April 27, 2004, she still reported having two to three severe headaches per week. (R. 211). On June 22, 2004, however, the headaches were increasing in frequency and she was having difficulty getting them under control. (R. 210). In July 2004, Plaintiff reported stress associated with her father being in hospice and complained of a constant headache. (R. 209). The headaches were also more frequent in September and November 2004. (R. 208-09).

On February 23, 2005, Dr. Diamond questioned, "HA [headaches] better overall?" (R. 207). At a subsequent visit on September 27, 2005, Plaintiff's headaches were better, but she was still having them three to four times per week. (R. 205). Dr. Diamond's final note of April 10, 2006 indicates that Plaintiff was having about four to five headaches per week, and was sensitive to light, sound and smells. (R. 204).

### 3.    Agency Reviewing Physicians

On November 1, 2006, Donald MacLean, Ph.D., completed a Psychiatric Review Technique of Plaintiff for the Bureau of Disability Determination Services ("DDS"). (R. 311-23). Dr. MacLean found insufficient evidence of any mental impairment or related functional limitations, and concluded, "[e]vidence is insufficient to establish a disability prior to [Plaintiff's] date last insured." (R. 311, 321, 323). Also on November 1, 2006, Dr. Marion Panepinto completed a Request for Medical Advice for DDS. (R. 308-310). Like Dr.

MacLean, Dr. Panepinto concluded that "[t]he medical evidence in file appears insufficient to indicate a finding of disabled can be made prior to DLI of 12/31/01." (R. 310). On February 20, 2007, Dr. Terry Travis affirmed Dr. Panepinto's evaluation. (R. 325-27).

## B.     Plaintiff's Testimony

At the January 8, 2008 hearing before the ALJ, Plaintiff testified that she began to experience headaches and double vision in 1996, leading to brain surgery in August of that year. (R. 19). She was diagnosed with a tumor on her optical nerve that cannot be removed. (R. 34). Prior to the surgery, Plaintiff worked as a teacher's aide. (R. 17). She resumed working from December 1996 to June 1997, but she had to make accommodations for her condition by skipping lunch and going into a dark room. (R. 18, 41-42). Plaintiff's contract was not renewed for the following school year, and she was unsuccessful in finding other work. (R. 18-20). Plaintiff stated that had she not lost her job with the school district, she "would have been determined to continue on" with that position. (R. 28). The "constant on your feet all day," however, would have been difficult for her, and "[s]ooner or later [she] would've had to give[] up." (*Id*.).

Plaintiff testified that from 1997 through December 31, 2001, she had severe headaches five to six times per week, lasting three to four hours each. (R. 24, 25). The pain would sometimes wake her up in the middle of the night four to five times per week, and by 8 a.m. she would have to go back to bed. (R. 24, 32). On occasion, the headaches were accompanied by nausea or vomiting, and could be triggered by light, sounds, odors, or stress. (R. 31, 33-34, 42-43). In addition, Plaintiff suffered from unpredictable "vision disturbances." (R. 22). To treat these headache symptoms, Plaintiff took Tylenol #3 and Vicodin, which made her "foggy," confused, and dizzy. (R. 26, 33).

After being referred to the Diamond Headache Clinic, Plaintiff was treated for depression as well as for her headaches. (R. 26-30). She was able to reduce her dependence on pain medications, and the severity and frequency of her headaches diminished. (R. 27, 29). She still generally had one headache a day, but she occasionally had headache-free periods of several days. (R. 27). As a result of the headaches, Plaintiff was no longer able to engage in fishing, shopping, canoeing, or gardening. (R. 34). She was able to drive, however, as long as she did not have a headache. (R. 43-44).

## C. Husband's Testimony

Plaintiff's husband, Roland Anderson, testified that she worked a regular schedule following her surgery in 1996 and up until her contract ended, but she had to "fight . . . through the day" and was "just wiped out . . . when she would come home." (R. 39). After about 1999 or 2000, she no longer had the "pep" to engage in activities with him such as fishing or gardening, and suffered from fatigue associated with the headaches. (R. 36, 38-39). Mr. Anderson recalled Plaintiff waking with headaches "very frequent[ly]." (R. 37). He also stated that her headaches improved "quite a bit" after she began going to the Diamond Headache Clinic, but that eventually, "everything sort of plateaued . . . at the same headache level all the time." (R. 40).

## D. Vocational Expert's Testimony

Lee Knutson testified at the hearing as a vocational expert. (R. 44-50). He characterized Plaintiff's prior work as a teacher's aide as either semi-skilled with medium exertion or semi-skilled with light exertion. (R. 46). The ALJ described a hypothetical individual of Plaintiff's age, education, work experience and skill set who can occasionally lift 20 pounds; frequently lift or carry 10 pounds; never climb ladders, ropes or scaffolds;

never be around concentrated exposure to unprotected heights; and must be able to sit or stand at will. (R. 46-47). The vocational expert testified that such an individual could not perform Plaintiff's past work as a teacher's aide, but could do other jobs available in the regional economy, such as bench assembler (2,000 jobs), order clerk (3,200 jobs), or surveillance system monitor (1,850 jobs). (R. 47).

The ALJ next asked the vocational expert to consider an individual who also was limited to performing sedentary work consisting of simple, routine and repetitive tasks. (R. 47-48). The vocational expert stated that such a person could perform the same jobs he listed previously. (R. 48). However, he stated that an individual would no longer be capable of performing these jobs if she was unable to engage in sustained work on a regular and continuing basis for 8 hours a day, 5 days a week, either because she regularly needed to be absent at least twice a month, or needed breaks exceeding 5 to 15 minutes every two hours plus a half-hour to an hour for lunch. (R. 49).

## E. Discussion of Borderline Age

Toward the end of the hearing, Plaintiff's attorney alerted the ALJ to the fact that Plaintiff was within a few months of turning 50 years old as of the DLI. He observed that she would be found disabled under the "grid rule" (a reference to the Social Security Administration's Medical-Vocational Guidelines, known as the "Grid") if she were 50 years old and limited to sedentary work. (R. 51). Counsel urged the ALJ to consider this, observing "I know there is ability for the Judge to, to grant as of, a couple of months prior to the actual birth date for, with regards to the, to the grid rule." (*Id.*). To this, the ALJ replied that: "They're, the dates are not to be mechanically applied" and asked whether Plaintiff wished to amend the onset dates. After some discussion of this question (counsel

said an earlier onset date would not help), the ALJ said he would take "a real close look at this file before we suggest any changes . . . in the dates ...."  (R. 51-52).

## F.    ALJ's Decision

In his written decision, the ALJ found that Plaintiff's headaches and "temporal craniotomy for biopsy of cavernous sinus lesion" are severe impairments, but that they do not meet or equal those listed in the Social Security Regulations.  (R. 61-62).  The ALJ determined that through the DLI of December 31, 2001, Plaintiff retained the residual functional capacity ("RFC") to perform sedentary work, with the following restrictions: (1) she must be allowed to sit or stand alternatively at will; (2) she can never climb ladders, ropes or scaffolds; (3) she must avoid concentrated exposure to unprotected heights; and (4) she is limited to performing simple, routine and repetitive tasks.  (R. 62).

In reaching this conclusion, the ALJ discussed Plaintiff's testimony concerning the limiting effects of her headaches and vision problems, but found that she was not entirely credible in that regard.  (R. 62-64).  He noted, for example, that Plaintiff's impairment "has improved and she is no longer taking pain medication for her headaches."  (R. 63).  The ALJ also observed that Plaintiff sought employment after the school district failed to renew her teacher's aide contract, and that she testified to being "determined" to continue working.  (R. 63-64).

With respect to the medical evidence, the ALJ acknowledged treatment records from Dr. Diamond indicating that Plaintiff complained of headaches of varying severity from May 20, 1999 to May 11, 2001.  (R. 63).  In the ALJ's view, however, those same records also indicate that Plaintiff's symptoms "were controlled through the use of pain medication."  (*Id.*).  In addition, the ALJ found it significant that Dr. Rosseau's records similarly reflect that

Plaintiff's headaches had improved over time, and that the size of the lesion had decreased as of March 20, 2001. (*Id.*). He noted, moreover, that Dr. Panepinto found insufficient medical evidence to support Plaintiff's allegations of disabling headaches and vision problems. (R. 64). The ALJ thus concluded that Plaintiff's headaches were "controlled by medication," and that she has experienced "steady improvement [since her August 1996 surgery] and no longer has to use pain medication to control her headaches." (*Id.*).

At Step 5, the ALJ found that, through the DLI of December 31, 2001 and considering Plaintiff's age, education, work experience and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff could perform and so she is not disabled. (R. 65). In reaching this conclusion, the ALJ noted that Plaintiff "was born on March 24, 1952 and was 49 years old, which is defined as a younger individual age 18-44 (sic),[2] on the date last insured (20 CFR 404.1563)." (R. 64). There is no mention of Plaintiff being within a few months of the next highest age category. The ALJ also stated that Plaintiff has at least a high school education and is able to communicate in English. (*Id.*). The ALJ noted that transferability of job skills is not material to the determination of disability because using the Grid as a framework supports a finding that Plaintiff is not disabled regardless of skill transferability. (*Id.*).

Since Plaintiff has additional limitations that preclude her from performing the full range of sedentary work, the ALJ indicated that he had heard testimony from a vocational expert on whether a person with Plaintiff's stated RFC, who was 49 years old as of the DLI, could adjust to other work. (R. 65). The ALJ stated that he accepted the vocational

---

[2] The age range for younger individuals is 18-49. *See* 20 C.F.R. § 404.1563(c); 20 C.F.R. Pt. 404, Subpt. P, App. 2 at § 201.00(h)(1).

expert's testimony that such a person could perform a number of other jobs such as a bench assembler (2,000 jobs), order clerk (3,200 jobs) or surveillance system monitor (1,850 jobs). (R. 64). Given her ability to perform a significant number of jobs available in the regional economy, the ALJ found that Plaintiff is not disabled. (R. 64-65).

## DISCUSSION

### A. Standard of Review

Judicial review of the Commissioner's final decision is authorized by Section 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). A "court will reverse an ALJ's denial of disability benefits only if the decision is not supported by substantial evidence or is based on an error of law." *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). Evidence is considered substantial "so long as it is 'sufficient for a reasonable person to accept as adequate to support the decision.'" *Ketelboeter v. Astrue*, 550 F.3d 620, 624 (7th Cir. 2008) (quoting *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). The reviewing court may not "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008); *see also* 42 U.S.C. § 405(b)(1) (denial of benefits must contain a discussion of the evidence and a statement of the Commissioner's reasons).

### B. Disability Standard

A claimant who can establish she is "disabled" as defined by the Social Security Act is entitled to disability insurance benefits. *Liskowitz v. Astrue*, 559 F.3d 736, 739-40 (7th

Cir. 2009). "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382(a)(3)(A). An individual is under a disability if she is unable to do her previous work and cannot, considering her age, education, and work experience, partake in any gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2)(A). Gainful employment is "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). In addition, a claimant must show that the disability arose while she was insured for benefits. *See* 42 U.S.C. §§ 423(a)(1)(A), (c)(1); *Senkiewicz v. Barnhart,* 409 F.3d 798, 802 (7th Cir. 2005).

In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work? 20 C.F.R. § 404.1520(a)(4); *Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir. 2001) (citations omitted). The steps are performed in sequence, and the ALJ only proceeds to the next step if he cannot make a final finding (of disabled or not disabled) at the prior step. 20 C.F.R. § 404.1520(a)(4). In order to determine at Step 4 whether the claimant can perform any past relevant work, the ALJ must first assess the claimant's RFC, *id.*, which is defined as the most that the claimant can do in light of the physical and mental limitations that affect the claimant's ability to perform in a work setting. 20 C.F.R. § 404.1545. If the inquiry reaches Step 5, the burden shifts to the ALJ to establish that the claimant is capable of

performing work in the national economy.  *Zurawski*, 245 F.3d at 886 (citation omitted).

This determination at Step 5 is made by assessing the claimant's age, education, work

experience, and RFC "to see if [the claimant] can make an adjustment to other work."  20

C.F.R. § 404.1520(a)(4)(v).

## C.    Analysis

In her motion, Plaintiff asserts three grounds for reversal, all of which concern

whether the Commissioner met his burden at Step 5 of the disability analysis.  Specifically,

she argues that the ALJ erred (1) by applying the age categories of the regulations in a

mechanical manner to classify her as a "younger individual" rather than considering

whether her borderline age made it more appropriate to place her in the next higher age

category, dictating a finding of disabled; (2) by finding her testimony concerning the severity

of her headaches less than fully credible and not discussing certain evidence; and (3) by

not including any RFC limits on her ability to sustain full-time work due to her headaches.

For the reasons set forth below, this Court agrees with Plaintiff and remands the case on

all three grounds.

### 1.    Borderline Age

For purposes of applying the Grid rules in this case, the Plaintiff's age categorization

is significant.  Based on her RFC, education, and work experience, if the ALJ had placed

Plaintiff in the 50 to 54 age group, rather than using her chronological age of 49, the Grid

would have dictated a finding that she was disabled on the last date she was eligible for

disability benefits.  But the ALJ did not address whether Plaintiff's borderline age – less

than three months shy of 50 – merited categorizing her in the next higher age group.

Instead, he merely noted that she was "born on March 24, 1952 and was 49 years old [on

her DLI], which is defined as a younger individual," and then concluded that using the Grid as a "framework," Plaintiff would be considered "not disabled." (R. 51-52). Then, after finding that Plaintiff had the RFC to perform sedentary work with certain limitations, he noted that the Grid rules could not be used to "direct a conclusion" because they did not exactly fit Plaintiff's vocational factors, as she had certain nonexertional limitations that prevented her from performing the full range of sedentary work. (R. 65). Accordingly, he posed hypothetical questions to a vocational expert that reflected Plaintiff's vocational profile, including her age, and the vocational expert opined that there were thousands of jobs in the Chicago area to which a person with this vocational profile could adapt. (R. 46-50, 65). Relying on this testimony, the ALJ concluded that Plaintiff was capable of adjusting to other jobs that existed in significant numbers, and therefore was not disabled. (R. 65-66).

Plaintiff challenges this determination, asserting that the ALJ made an improper mechanical application of the age categories by ignoring the fact that she was at a "borderline" age. *See* 20 C.F.R. § 404.1563(b) (If a claimant is "within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that [claimant is] disabled, [the ALJ] will consider whether to use the older age category after evaluating the overall impact of all the factors of [claimant's] case.") Plaintiff contends the ALJ should have considered her borderline age and categorized her as "closely approaching advanced age" (ages 50 to 54), resulting in a finding that she is disabled.

        **a.**     **The Regulatory Framework:** In determining whether a claimant can make an adjustment to other work, the ALJ must consider the claimant's vocational factors

of RFC, age, education, and work experience. 20 C.F.R. § 404.1520(g)(1). Prior to 1978, ALJs relied primarily on vocational experts to establish at Step 5 the existence of suitable jobs in the economy based on the claimant's capacities and limitations. *See Heckler v. Campbell,* 461 U.S. 458, 461, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983) ("Campbell"). Responding to criticism that these individualized assessments by different vocational experts led to inconsistent treatment of similar claimants, the Secretary of Health and Human Services[3] promulgated the Medical-Vocational Guidelines, known as the "Grid," to promote uniformity and efficiency in disability adjudications. *Id.* The Grid includes three tables reflecting the capability to work at a specified level of exertion on a sustained basis for sedentary work, light work, and medium work. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2 at tbls 1-3. Each table contains a series of rules, which incorporate the principal vocational elements of age, education and skill level from past relevant work to direct an outcome of "disabled" or "not disabled" based on these factors and the claimant's RFC. *Id.* The age categories are: younger (18-49); closely approaching advanced age (50-54); and advanced age (55 or older). *Id.* at § 201.00(d), (g) & (h); 20 C.F.R. § 404.1563(c)-(e).

The Grid rules permit the Social Security Administration to take "administrative notice" of the existence of various classes of jobs in the national economy and their vocational prerequisites; "[t]hus, when all factors coincide with the criteria of a rule, the existence of such jobs is established." 20 C.F.R. Pt. 404, Subpt. P, App. 2 at § 200.00(b). In other words, if the criteria of a Grid rule exactly fit a claimant's vocational factors, the rule dictates the outcome; but if no rule fits a claimant exactly, the Grid provides only a

---

[3] Prior to March 31,1995, responsibility for administering the Social Security and Supplemental Security Income programs fell on the Secretary of Health and Human Services.

"framework" or guidance for the disability determination. *Id.* at § 200.00(a); *see also*
*Campbell,* 461 U.S. at 461-62 ("Where a claimant's qualifications correspond to the job
requirements identified by a rule, the guidelines direct a conclusion as to whether work
exists that the claimant could perform."). If no Grid rule corresponds with the claimant's
qualifications and limitations, the ALJ must consider supplemental evidence to reach a
determination. 20 C.F.R. Pt. 404, Subpt. P, App. 2 at § 200.00(a); *see also Campbell,* 461
U.S. at 462 n.5 ("If an individual's capabilities are not described accurately by a rule, the
regulations make clear that the individual's particular limitations must be considered.").
This supplemental evidence may include vocational expert testimony. *See Zurawski v.*
*Halter*, 245 F.3d 881, 889 (7th Cir. 2001) (citing *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir.
1994)) (where a nonexertional limitation may substantially limit the range of work claimant
can perform, the ALJ must consult a vocational expert). Furthermore, the Grid rules
establish that where, like here, the claimant has both exertional and nonexertional
limitations, the ALJ must first determine whether the claimant is disabled based on the
exertional limitations alone and, if not, only then should the ALJ go on to consider whether
the claimant's work capability is further diminished by the nonexertional limitations. 20
C.F.R. Pt. 404, Subpt. P, App. 2 at § 200.00(e)(2).

The regulations define "age" to mean "chronological age." 20 C.F.R. § 404.1563(a).
But most relevant to the Plaintiff's argument in this case, the regulations provide the
following explanation of how the age categories are to be applied:

> . . . We will use each of the age categories that applies to you during the
> period for which we must determine if you are disabled. We will not apply the
> age categories mechanically in a borderline situation. If you are within a few
> days to a few months of reaching an older age category, and using the older
> age category would result in a determination or decision that you are

disabled, we will consider whether to use the older age category after evaluating the overall impact of all the factors of your case.

*Id.* at § 404.1563(b).[4]   To interpret the regulations for its ALJs, the Social Security Administration produced a guidance document called the *Hearings, Appeals, and Litigation Law Manual* (HALLEX).  *See Perkins v. Chater*, 107 F.3d 1290, 1294 (7th Cir. 1997) (noting that the courts have considered the HALLEX as indicative of how the Social Security Administration instructs its ALJs to adjudicate these matters).  In borderline age situations, the HALLEX instructs ALJs to take a "sliding scale" approach:

> [T]he claimant must show progressively more vocational adversity(ies)–to support use of the higher age–as the time period between the claimant's actual age and his or her attainment of the next higher age category lengthens. . . . Absent a showing of additional adversity(ies) justifying use of the higher age category, the adjudicator will use the claimant's chronological age–even when the time period is only a few days. The adjudicator need not explain his or her use of the claimant's chronological age.

Hallex II-5-3-2 (Nov. 2, 1993), available at http://www.ssa.gov/OP_Home/hallex/hallex.html (last visited June 10, 2011).  An internal agency manual such as the HALLEX lacks the force of law, however, and is "entitled to respect" only to the extent it is persuasive.  *See Christensen v. Harris County*, 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000).[5]

---

[4]      The Commissioner does not challenge whether Plaintiff's age – less than three months shy of 50 – is "within a few days to a few months" of the next age category.  In any event, while the regulations are less than precise about how many months is "a few," the case law makes clear that Plaintiff's age creates a borderline situation.  See *Smith v. Barnhart*, No. 00 C 2643, 2002 WL 126107, *3 (N.D. Ill. Jan. 31, 2002) (collecting cases on age ranges that fall within the borderline window);  *Freundt v. Massanari*, No. 00 C 4456, 2001 WL 1356146 (N.D. Ill. Nov. 2, 2001) (a gap of three months or less creates a borderline situation).

[5]      The HALLEX manual predates the amendments to the regulations in 2000.  Among other changes, the amendments revised the definition of "age" set forth in § 404.1563 to omit the language that directed ALJs to consider, in determining the claimant's age, the extent to which age affects the claimant's ability to adapt to a new work situation and perform work in competition with others.  Neither of the parties raised the issue of whether or how the amendments may affect the applicability of the HALLEX guidance.

**b.** **An ALJ Must Explicitly Consider Borderline Age Situations**:  An examination of the case law in this district shows that the courts have required ALJs to consider and explain their age category determinations in borderline age situations.  For example, in *Freundt v. Massanari*, No. 00 C 4456, 2001 WL 1356146 (N.D. Ill. Nov. 2, 2001), the court addressed a situation, like Plaintiff's, in which the Grid would have dictated a finding of "disabled" had the plaintiff been categorized in the higher age group.  Like in this case, the ALJ in *Freundt* made no reference to the borderline age issue beyond observing that the Plaintiff was a "younger individual" based on his chronological age of approximately 49 and six months.  *Id.* at *17.  The court held, "It is the Commissioner's burden in the first instance to discuss the borderline age issue whenever the claimant is within a few days or months of the next age category and the advance to the next age category would change the outcome of applying the Grid."  *Id.* at *19 (citing *Daniels v. Apfel*, 154 F.3d 1129, 1136 (10th Cir. 1998)).  The court noted that the Commissioner must make this determination "on whatever evidence is available," which may (but is not required to) include expert evidence, such as vocational expert testimony.  *Id.* at *19-20 (citing *Daniels*, 154 F.3d at 1136).  Moreover, the court noted the absence of any legal authority "for the proposition that combining use of the Grid with obtaining testimony from a vocational expert automatically proves the ALJ did not apply the Grid mechanically regarding the age category."  *Id.* at *20 (citing *Graham v. Massanari*, No. 00 C 4669, 2001 WL 527326, *8 (N.D. Ill. May 9, 2001)).  Because the ALJ failed to make an age category determination, the court remanded the case, directing the Commissioner to "analyze the borderline age issue and explain in the ruling what evidence was considered in making the age category decision."  *Id.* at *20.

The court in *Graham v. Massanari* reached the same conclusion on identical facts as this case, remanding the matter for application of the borderline age regulation since "[t]here is no evidence or indication in the record that the ALJ ever considered the borderline regulation as applied to Plaintiff." *Graham,* 2001 WL 527326, *8. As in this case, the plaintiff in *Graham* was several months shy of age 50, at which point the Grid would have directed a finding of "disabled." *See id.* Also as in this case, the ALJ concluded that the Plaintiff had nonexertional limitations that prevented him from performing the full range of sedentary work, and therefore considered the testimony of a vocational expert before reaching a final determination that the plaintiff was capable of performing other work and, thus, was not disabled. *See id.* at *6-7. The *Graham* court was not persuaded to find the age category application sufficient based solely on the fact that the ALJ relied on a vocational expert, finding no legal support for the assertion that the age categories cannot be found to be applied mechanically when vocational expert testimony is considered. *Id.* at *8. Other courts in this district also have remanded cases where the ALJ failed to make an age category determination in a borderline age situation. *See Young v. Barnhart*, 287 F.Supp.2d 905, 913 (N.D. Ill. 2003); *Hawkins v. Apfel*, No. 97 C 6760, 1998 WL 378421, *1 (N.D. Ill. July 1, 1998); *Tousignant v. Apfel*, No. 97 C 4150, 1998 WL 142415, *5 (N.D. Ill. Mar. 26, 1998); *see also Cuevas v. Astrue*, No. 06 C 5783, at 32, 34-35 (N.D. Ill. Aug. 27, 2007) (Keys, J.) (unpublished) (Doc. 18-1) (remanding based, in part, on ALJ's failure to explain her decision to use claimant's chronological age in a borderline age situation).

This case differs considerably from the situation in *Smith v. Barnhart*, for example, where the court rejected the plaintiff's borderline age argument because "the ALJ not only

expressly considered the borderline age situation, but he also provided a detailed rationale for choosing to place [the plaintiff] in the younger age individual category as opposed to the approaching advanced age category." *Smith v. Barnhart*, No. 00 C 2643, 2002 WL 126107, *4 (N.D. Ill. Jan. 31, 2002). Notably, like the courts in *Freundt* and *Graham*, the *Smith* court adopted the Tenth Circuit's approach, which finds age categorization in a borderline situation to be "a factual rather than a discretionary matter." *Id.* at *3 (citing *Daniels v. Apfel*, 154 F.3d 1129, 1135-36 (10th Cir. 1998)). As the Tenth Circuit summarized it:

> The Commissioner must determine based on whatever evidence is available which of the categories on either side of the borderline best describes the claimant, and the Commissioner may apply that category in using the grids. Like any factual issue, a finding regarding the appropriate age category in which to place a claimant must be supported by substantial evidence.

*Id.* at 1136. By contrast, in this case the ALJ never even mentioned in his decision that Plaintiff presented a borderline age situation, let alone explained what evidence he relied upon in electing to use her chronological age.

There is a divergence of opinion within the circuits on the issue of whether an ALJ must explicitly show in his decision that he considered the borderline age issue. The Seventh Circuit, in which this Court sits, has not expressly ruled on the issue. In line with the rulings in this district, the Tenth and Third Circuits have held that an ALJ must show in his decision that he has performed the analysis required in a borderline age situation by 20 C.F.R. § 404.1563. *See Daniels*, 154 F.3d at 1136; *Kane v. Heckler*, 776 F.2d 1130, 1132-34 (3d Cir. 1985). More specifically, an ALJ must make an explicit age category determination based on whatever evidence is available, and this finding must be supported by substantial evidence. *See Daniels*, 154 F.3d at 1136. Multiple courts in this district have

23

expressly adopted the Tenth Circuit's approach in *Daniels. E.g., Smith*, 2002 WL 126107, *4; *Freundt*, 2001 WL 1356146, *19-20; *Graham,* 2001 WL 527326, *8.

While all the circuits that have addressed this issue agree that the ALJ must consider a borderline age situation, several circuits have rejected the argument that the borderline-age regulations are applied mechanically in violation of § 404.1563 when the ALJ fails to explicitly indicate that consideration was given to the claimant's borderline age status. For example, in *Lockwood v. Commissioner Social Security Administration,* 616 F.3d 1068 (9th Cir. 2010), *cert. denied,* 2011 WL 829014 (May 11, 2011), the Ninth Circuit inferred that the ALJ had considered the borderline age situation based solely on the fact that the ALJ's decision cited Plaintiff's age and the regulation. In *Miller v. Commissioner of Social Security,* 241 F. App'x 631, 635 (11th Cir. 2006), the Eleventh Circuit found no violation, despite the lack of a borderline age determination, where the ALJ found such an age determination to be "essentially theoretical" since the plaintiff had nonexertional impairments that required vocational expert testimony at Step 5.[6] Finally, relying on the regulatory language and the procedural guidance in the HALLEX manual, the Sixth Circuit in *Bowie v. Commissioner of Social Security*, 539 F.3d 395, 399 (6th Cir. 2008), held that although ALJs are obligated not to apply the age categories mechanically, "nothing in [§ 404.1563's] language obligates an ALJ to address a claimant's borderline age situation in his opinion or explain his thought process in arriving at a particular age category

---

[6]     Alternatively, the *Miller* court rejected plaintiff's argument on the ground that the burden rests with the borderline-age plaintiff to proffer evidence that he or she should be bumped up to the next age category, 241 F. App'x at 634, a view which the Seventh Circuit has soundly rejected. *See Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004) (citing *Zurawski*, 245 F.3d at 886) (holding that the burden shifts to the ALJ if the claimant makes it past Step 4); *see also Smith*, 2002 WL 126107, *4 (citing *Daniels*, 154 F.3d at 1134).

determination." The *Bowie* court rejected the approach taken by the Tenth Circuit in *Daniels* and the Third Circuit in *Kane* on the ground that *Kane* was decided prior to publication of the HALLEX manual, which states that the ALJ need not explain his or her use of the claimant's chronological age, *see* Hallex II-5-3-2, and *Daniels* relied upon *Kane*. *Id.* at 401-403.[7]

This Court is not persuaded that it should reject the precedent in this district, adopting the Third and Tenth Circuit approaches, in favor of the alternate approach adopted by the Sixth, Ninth, and Eleventh Circuits. Even the Sixth Circuit acknowledges that ALJs must provide enough detail to show that their decisions are supported by substantial evidence as required by 42 U.S.C. § 405(g). *See Bowie*, 539 F.3d at 400 ("That § 1563(b) does not impose a *per se* procedural requirement to address borderline age categorization explicitly in every borderline case does not relieve ALJs of their obligation to provide enough explanation of their overall disability determination to assure reviewers that their decisions are supported by substantial evidence."). This Court is more persuaded by the dissent in *Bowie*, which advocates adopting the Tenth Circuit's approach in *Daniels* of requiring that "ALJs must provide some record of their thought process regarding the requirements of § 404.1563(b)." *Bowie*, 539 F.3d at 403 (Moore, J., dissenting). As the dissent asserts, "the ALJ's failure to note that the ALJ has considered whether a claimant falls within a borderline category and, if so, whether bumping the claimant up is warranted, constitutes a failure to offer findings of fact and reasons for the decision." *Id.* at 404. In the

---

[7]    The Tenth Circuit has not subsequently ruled on this issue, while the Third Circuit affirmed its approach, and continued to rely on *Kane*, after publication of the HALLEX manual. *See Lucas v. Barnhart*, 184 F. App'x 204, 208 (3d. Cir. 2006) (holding that the ALJ's decision is not supported by substantial evidence because the record contains no factual findings relevant to the borderline age analysis under § 404.1563(b)).

Court's view, the Sixth Circuit's deference to the HALLEX manual is not merited to the extent that it does not require ALJs to show that they have given the requisite consideration to the claimant's age categorization in a borderline situation, including articulating the justification for the age category determination where the evidence is equivocal.

In this case, the ALJ not only failed to articulate a non-mechanical conclusion about which age category was appropriate for Plaintiff, he failed to state whether he considered the borderline-age issue at all. Therefore, it is impossible to know what conclusions, if any, the ALJ reached based on the evidence in the record. The mere fact that the ALJ consulted a vocational expert – which was required due to Plaintiff's nonexertional limitations rendering the Grid rule non-dispositive – does not automatically prove that the ALJ did not apply the Grid mechanically regarding Plaintiff's age category. *See Freundt*, 2001 WL 1356146, *20; *Graham*, 2001 WL 527326, *8. Indeed, the ALJ never stated that he relied on the vocational expert's testimony, or any other evidence, in determining Plaintiff's age category. The ALJ must, at a minimum, acknowledge that he considered the borderline-age issue non-mechanically, and doing so likely requires some explanation, however brief, of the conclusion he reached. Anything less makes judicial review impossible.

In summary, the ALJ failed to show that he considered Plaintiff's borderline age or otherwise explain why he used her chronological age instead of placing her in the next higher age category. As a result, the age category determination is not supported by substantial evidence and must be reversed.

## 2.    The RFC Finding

Plaintiff also argues that the ALJ's RFC finding is flawed because he ignored medical records supporting Plaintiff's claims of disability.  The ALJ determined that as of her DLI of December 31, 2001, Plaintiff was capable of performing sedentary work, as long as she could sit and stand at will, never have to climb ladders, ropes or scaffolds, avoid concentrated exposure to unprotected heights, and engage in only simple, routine and repetitive tasks.  (R. 62).  The ALJ acknowledged Dr. Diamond's treatment records showing that Plaintiff "complained of headaches of varying severity," but also found that those same records showed that Plaintiff's "symptoms were controlled through the use of pain medication."  (R. 63).  Rather than cite to any specific record from the Diamond Headache Clinic, however, the ALJ relied primarily on Dr. Rosseau's treatment notes.  For example, Dr. Rosseau stated that: (1) Plaintiff's headaches were "well tolerated" on her medications as of November 1999 (R. 270); (2) she had "improved" as of February 18, 2000 (R. 269); and (3) her headaches were "much improved" and "well controlled" with medication as of March 27, 2001.  (R. 268).

The problem is that Dr. Diamond's notes do not so clearly reflect steady improvement in Plaintiff's condition.  From 1997 to 2005, Plaintiff consistently reported two to three moderate to severe headaches per week.  On August 12, 1999, she reported having five severe headaches since July 26, 1999 that left her bedridden, and one additional mild headache per week.  (R. 227).  In November 1999, she complained that for a two-week period, she had woken up in the middle of the night with headaches.  She also told Dr. Diamond that she was having almost daily headaches four to five times per week.  (R. 226).  On February 4, 2000, Plaintiff reported a headache that could not be relieved

with Tylenol #3, and that resulted in nausea and vomiting. Dr. Diamond prescribed Vicodin. (R. 225). Shortly after her visit with Dr. Rosseau on February 18, 2000, Plaintiff told Dr. Diamond that she had experienced three week-long headaches that month and could not sleep. She improved a little when she switched back to brand name Vivactil, but she also reported getting headaches in the afternoon, which she treated with Tylenol #3 and sleep. The headaches initially went away, but then returned in the late evening, along with double vision. (R. 224). In November 2000, Plaintiff reported experiencing three to four mild to moderate headaches per week. (R. 221). As of May 10, 2001, Plaintiff still had three to four moderate to severe headaches per week, though she was able to abort them with medications. (R. 220). On November 8, 2001, Plaintiff said that she had had "the best summer" without severe headaches, but she also complained of having six or seven headaches at a level of 7 out of 10, and getting headaches twice a week that fall. (R. 219).

The ALJ failed to discuss any of these records, or to explain how they support his conclusion that Plaintiff "experienced steady improvement" and had her headaches under control with pain medication. (R. 64). *See* SSR 96-8p, at *5 ("The RFC assessment must be based on *all* of the relevant evidence in the case record . . . .") (emphasis in original); *see also Alexander v. Astrue*, No. 09 C 3406, 2010 WL 3199356, at *10 (N.D. Ill. Aug. 10, 2010) ("The ALJ must examine the entire record to construct an RFC and confront evidence that does not support his determination.") Notably, the ALJ twice stated that Plaintiff was no longer taking pain medication at all, (R. 63-64), but Dr. Diamond routinely prescribed Tylenol #3 both before and after the DLI. (*See, e.g.,* R. 209, 213, 218, 219, 225, 227).

Dr. Diamond also noted that Plaintiff experienced sensitivity to light and sounds when she got headaches, and Plaintiff testified at the hearing that her headaches could be triggered by light, sounds, odors and stress. (R. 31, 33-34, 42-43, 219). Yet the ALJ made no mention of this evidence, much less explained whether or why he rejected it. Defendant claims that the ALJ reasonably accommodated these sensitivities in the RFC, but it is not clear how performing simple, repetitive tasks, sitting and standing at will, and avoiding climbing and exposure to heights addresses difficulties with smells, sounds and lights.

This error is not harmless because SSR 96-8p provides that "[i]n assessing RFC, the [ALJ] must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule) . . . ." *Id.* at *7. At the January 8, 2008 hearing, the vocational expert opined that an individual with Plaintiff's RFC could not perform any "competitive work" if she required more than customary breaks (i.e., 5 to 15 minutes every two hours plus a half-hour to an hour for lunch), or was regularly absent two days a month. (R. 48-49). *Cf. Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008) ("A person who has a chronic disease . . . and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days," but she could not hold down a full-time job if she was only well enough to work half the time). By omitting any discussion of Dr. Diamond's treatment notes regarding the frequency of Plaintiff's headaches, potential triggers, and her methods of treating them (including sleep), the ALJ failed to build an accurate and logical bridge from the evidence to his conclusion that Plaintiff is capable of full-time employment. *Berger*, 516 F.3d at 544.

Defendant stresses that neither Dr. Rosseau nor Dr. Diamond recommended any restrictions on Plaintiff's activities. (Doc. 22, at 6). Defendant also makes much of the fact that Plaintiff told Dr. Diamond she was going on vacation or out of town several times. (R. 221, 223, 227). None of these facts appears in the opinion of the ALJ, however, and so may not be used as grounds to uphold the ALJ's decision on review. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87-88, 63 S.Ct. 454, 87 L.Ed 626 (1943); *Martinez v. Astrue*, 630 F.3d 693, 694 (7th Cir. 2011).

Nor is the Court persuaded that the ALJ's decision may be upheld based on the fact that Dr. MacLean and Dr. Panepinto found insufficient evidence of any disability. (Doc. 22, at 5). The ALJ does refer to these opinions, and it is true that Dr. Maclean endorsed Dr. Panepinto's finding that "[t]he medical evidence in file appears insufficient to indicate a finding of disabled can be made prior to DLI . . . ." (R. 310). At the same time, neither physician checked the box on the reviewing form indicating that Plaintiff's headaches were non-severe. (R. 308, 325). Moreover, the ALJ had an obligation to review the significant evidence from Plaintiff's treating physician that she continued to suffer regularly from severe headaches that arguably would prevent her from maintaining a full-time job.

In conclusion, the ALJ's RFC assessment is not supported by substantial evidence and must be reversed.

### 3.     The ALJ's Credibility Assessment

Plaintiff finally argues that the ALJ erred in discounting her testimony about the severity of her headaches. In assessing a claimant's credibility when the allegedly disabling symptoms (such as pain or fatigue) are not objectively verifiable, an ALJ must first determine whether those symptoms are supported by medical evidence. *See* SSR 96-7p,

at *2; *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007). If not, SSR 96-7p requires the ALJ to "consider the entire case record and give specific reasons for the weight given to the individual's statements." *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009) (quoting SSR 96-7p). The ALJ should look to a number of factors to determine credibility, including "the objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, types of treatment received and medication taken, and 'functional limitations.'" *Id.* (quoting 20 C.F.R. § 404.1529(c)(2)-(4)).

Hearing officers are in the best position to evaluate a witness's credibility and their assessment will be reversed only if "patently wrong." *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). Still, an ALJ must connect his credibility determinations by an "accurate and logical bridge" to the record evidence. *Sarchet*, 78 F.3d 305, 307 (7th Cir. 1996) (ALJ's credibility determination resting on a number of erroneous or illogical material statements reversed, despite substantial evidence supporting it); *accord, Ribaudo v. Barnhart,* 458 F.3d 580, 584 (7th Cir. 2006); *see also Sayles v. Barnhart*, No. 00 C 7200, 2001 WL 1568850, at *7 (N.D. Ill. Dec. 7, 2001) (Schenkier, J.) (particular need to establish logical bridge in credibility determinations). In addition, however deferential the standard of review of an ALJ's credibility determination, the ALJ still must discuss significant evidence contrary to his conclusion. *See Herron v. Shalala*, 19 F.3d 329, 333-34 (7th Cir. 1994)*; Zblewski v. Schweiker,* 732 F.2d 75, 78-79 (7th Cir. 1984); *Hall v. Barnhart*, No. 04 C 2967, 2005 WL 2129060, at *16 (N.D. Ill. Aug. 12, 2005); *see also* SSR 96-7p, at *4 (ALJ must consider "entire case record" in evaluating credibility of claimant's statements about symptoms). Because the ALJ's conclusion that Plaintiff's reports of her pain were not fully credible

rested on impermissible inferences and failures to discuss contrary evidence, this Court must reverse and remand.

Plaintiff first contends that it was logically inconsistent for the ALJ to find that her headaches were a "severe" impairment at Step 2 of the analysis, and then rely on Dr. Panepinto's opinion that there was insufficient evidence to support her allegations of disabling headaches and visual problems. However, "step two of the sequential evaluation . . . is a threshold determination." *Fredenhagen v. Astrue*, No. 09 C 4936, 2010 WL 3937474, at *7 (N.D. Ill. Oct. 4, 2010). The mere fact that there was medical evidence demonstrating the existence of a severe impairment that "significantly limits [Plaintiff's] physical . . . ability to do basic work activities," 20 C.F.R. § 404.1520(c), in no way undermines Dr. Panepinto's conclusion that the same evidence was insufficient to establish that the impairment rose to the level of a disability as defined under the Act.

Plaintiff next objects that the ALJ failed to consider her pain medication and daily activities, factors that both support her claims of disabling limitations. In fact, the ALJ expressly recounted Plaintiff's testimony that the headaches kept her from leaving the house or performing simple household chores, and that the pain was "so severe that she was taking a number of medications, including Tylenol #3 (with cod[e]ine) and Vicodin." (R. 61, 63). The ALJ also discussed how Plaintiff would "frequently wake up at 3 am because of her headaches," which limited her daily activities. (R. 63). Plaintiff notes that the ALJ made no mention of her husband's testimony that she lacks the energy to engage in hobbies such as gardening. (Doc. 18, at 13). That testimony, however, is largely duplicative of Plaintiff's own statements. The "ALJ is not required to address every piece of evidence," *Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir. 2000), and "we give the opinion

a commonsensical reading rather than nitpicking at it." *Shramek v. Apfel,* 226 F.3d 809, 811 (7th Cir. 2000).

More troubling is the fact that the ALJ considered Plaintiff's efforts to find work after her contract as a teacher's aide was not renewed. Plaintiff testified that she was "determined" to find work, and thereafter sought employment at the local grocery and as a secretary, "[b]ut when you put down that you have a brain tumor on an application, there's very little calls back [sic]." (R. 19, 27). On these facts, without any other circumstances that might undercut her credibility, "[P]laintiff's attempts to secure employment are relevant only to her motivation and not to whether she was, in fact, disabled." *Bartell v. Cohen*, 445 F.2d 80, 82 (7th Cir. 1971). As the Seventh Circuit has explained,

> A claimant might seek a job in ignorance of the nature of his conditions, only to find later, after being hired, that his attempt to work is unsuccessful due to his disabilities; or he might work only an hour or two a day; or receive gratuitous or charitable employment.

*Heldenbrand v. Chater*, 132 F.3d 36 (Table), at *14 (7th Cir. 1997).

Defendant responds only that the Eighth Circuit has permitted ALJs to use a claimant's efforts to seek employment to undercut her credibility. *See, e.g., Black v. Apfel*, 143 F.3d 383, 387 (8th Cir. 1998) (subjective complaints of disabling pain not fully credible notwithstanding lengthy work history where the claimant continued to seek work and receive unemployment benefits after her alleged disability onset date); *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994) (claimant's intention to return to work "tends to prove that he is able to work."). The Seventh Circuit has found that the particulars of a claimant's efforts to find work may detract from her credibility in certain circumstances. *See Schmidt*

*v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005) ("[C]laimant's decision to apply for unemployment benefits and represent to state authorities and prospective employers that he is able and willing to work," along with affirmative efforts to find employment, are factors to consider in the credibility analysis); *Knox v. Astrue*, 327 F. App'x 652, 656 (7th Cir. 2009) (ALJ properly discounted claimant's credibility where he applied for a strenuous position as a welder, and made statements in that application denying any current back pain or symptoms). Here, however, Plaintiff's mere "determination" to work, without more, was not a proper basis for discounting her credibility.

The ALJ also found Plaintiff not entirely credible based on his conclusion that Plaintiff's headaches were controlled by medication and had steadily improved since August 1996. (R. 63). As discussed earlier, these conclusions are contrary to a number of treatment records that the ALJ failed to discuss, and thus, they cannot support the credibility determination in this case. *See Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006) (an ALJ's credibility finding is not binding if it is "based on errors of fact or logic.")

Because the ALJ's credibility finding is contrary to unanalyzed evidence from Dr. Diamond, and improperly relies on Plaintiff's determination to find work, it is not supported by substantial evidence and must be reversed.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [Doc. 17] is granted. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion.

ENTER:

Dated: June 13, 2011

SHEILA FINNEGAN
United States Magistrate Judge